# HICKORY v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 491. Submitted March 5, 1895. — Decided January 6, 1896.

An assignment of error which indicates the subject-matter in the charge to
which the exceptions relate with sufficient clearness to enable the court,
from a mere inspection of the charge, to ascertain the particular matter
referred to, is sufficient.

Acts of concealment by an accused are competent to go to the jury as tend-
ing to establish guilt, but they are not to be considered as alone conclu-
sive, or as creating a legal presumption of guilt, but only as circumstances
to be considered and weighed in connection with other proof with the
same caution and circumspection which their inconclusiveness, when
standing alone, requires.

The presumption of guilt arising from the flight of the accused is a pre-
sumption of fact — not of law — and is merely a circumstance tending
to increase the probability of the defendant's being the guilty person,
which is to be weighed by the jury like any other evidentiary circum-
stance.

A statement in a charge to the jury that no one who was conscious of
innocence would resort to concealment is substantially an instruction
that all men who do so are necessarily guilty, and magnifies and distorts
the power of the facts on the subject of the concealment.

The court below charged the jury as to the probative weight which should
be attached to the flight of the accused, as follows : "And not only this,
but the law recognizes another proposition as true, and it is that 'the
wicked flee when no man pursueth, but the innocent are as bold as a
lion.' That is a self evident proposition that has been recognized so
often by mankind that we can take it as an axiom and apply it to this
case." *Held*, that this was tantamount to saying to the jury that flight
created a legal presumption of guilt, so strong and so conclusive, that it
was the duty of the jury to act on it as axiomatic truth, and as such that
it was error.

On these points the charge of the court was neither calm, nor impartial, but
put every deduction which could be drawn against the accused from the
proof of concealment and flight, and omitted or obscured the converse
aspect; and in so doing it deprived the jury of the light requisite to the
safe use of these facts for the ascertainment of truth.

The plaintiff in error being indicted for the murder of one Wilson, became
a witness on his own behalf on his trial. The court charged the jury:
"Bearing in mind that he stands before you as an interested witness,

while these circumstances are of a character that they cannot be bribed, that cannot be dragged into perjury, they cannot be seduced by bribery into perjury, but they stand as bloody naked facts before you, speaking for Joseph Wilson and justice, in opposition to and confronting this defendant, who stands before you as an interested party; the party who has in this case the largest interest a man can have in any case upon earth." *Held*, that such a charge crosses the line which separates the impartial exercise of the judicial function from the region of partisanship where reason is disturbed, passions excited, and prejudices are necessarily called into play.

THE case is stated in the opinion.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

Sam Downing, alias Sam Hickory, and Thomas Shade were indicted in October, 1891, for the murder in the Indian Territory of a white man by the name of Joseph Wilson. Downing, who was at the time of the alleged killing nineteen years old, was tried and convicted, and the case was brought by error here. The verdict and judgment were reversed and the case was remanded for a new trial. *Hickory* v. *United States*, 151 U. S. 303. On the trial, the defendant was again found guilty of murder, and the case for the second time comes here by error. The assignments of error are twelve in number, and all relate to errors alleged to have been committed by the trial court in the charge given to the jury. The charge covers twenty pages of the printed record. To correctly understand the merits of the various assignments of error it is necessary to briefly refer to the testimony which is stated in a condensed form in the bill of exceptions.

The testimony for the prosecution tended to show that Wilson, the deceased, was a deputy marshal and had a warrant for the arrest of the accused upon the charge of taking whiskey into the Indian country. With this warrant he started to a house where he expected to find Hickory, being

accompanied by John Carey. Wilson and Carey proceeded together until just before reaching this house. Carey then informed Wilson that he would go no further with him, as he did not wish to be known in the neighborhood in connection with the arrest. It was then arranged between them that Carey should remain in the woods while Wilson should continue on to the house and make the arrest. Wilson had with him "a large white handle pistol," and told Carey that if he found the accused he would fire off his pistol after arresting him, in which case Carey would meet him, "close to Brown's on the prairie." Wilson then proceeded on his way and Carey remained in the woods awaiting the signal agreed upon. In about half an hour Carey heard the firing of "a gun," then "two guns" went off together, then there were several shots "which sounded as if they were fired by one man, and as if he was taking his time to fire." Carey waited for Wilson until sundown, and as he did not then come he (Carey) went to the house of Squirrel Carey and "told him about hearing the shooting and that Wilson was to fire his pistol, but he did not say how many times." The government also introduced proof showing that some days afterwards the body of Wilson was found in a gulch or ravine, and there was a gunshot wound straight through the body; that the skull was fractured, and that there was a contused wound or bruise at the base of the brain. The person of the deceased had not been rifled, and on it was found his watch and papers, among the latter the warrant for the arrest of Hickory.

Further testimony was introduced tending to show that an examination of the house where Wilson had gone to arrest the accused disclosed spots of blood on the porch, in the house, on the door, and in the yard at several places, and on a wagon standing in the yard, and that efforts had been made to conceal these spots of blood. There was also testimony showing bullet marks in the house; that "certainly one and probably two shots were fired from a southeasterly direction where the marshal likely was at the commencement of the shooting, towards the front door, one striking a corner

post and the other the wall near the door. Two shots had been fired from the inside of the house through the front door, as shown by the holes. One shot had been fired from the large front room, glancing the middle door shutter, which was open, and going into the wall of the rear room, and another had gone into the wall of said rear room opposite the centre of the middle door."

Testimony was further offered tending to show that Wilson's horse was found dead some distance from the house, and the witnesses could not tell whether " its throat had been cut or eaten by wild animals, as they had been working on it." It was also shown that when Wilson went to the house he had a pistol, a bridle, and a saddle, on which a coat was strapped, and these things were not found. The government then further introduced testimony tending to show that the accused had told three or more witnesses "that he shot the deceased, and hit him the first shot, but did not kill him, and that Tom Shade, who was there with defendant, knocked the deceased in the head with an axe ; that after the killing an attempt had been made to destroy the blood spots in the house and yard." It further introduced testimony tending to show that after the killing the accused was " ' scouting,' that is, avoiding arrest." Upon this proof the case for the prosecution was rested. The accused, after introducing testimony tending to rebut the alleged confession by showing that he was not in the place named at the time it was stated the confession had been made, then testified in his own behalf, admitting the killing of Wilson, and giving substantially the following account of the occurrence : He was in the yard hitching up a team of horses for the purpose of hauling a load of posts, when Wilson came into the yard and asked him his name, which he gave him, and thereupon Wilson put him under arrest and read the warrant to him; that he replied, "All right," and unharnessed the horses and turned them loose; that Wilson asked him whether he was going to ride one of the horses, and he replied, "No, that they did not belong to him ; " that thereupon Wilson asked him who was the owner of the horses, and he said the owner was not there,

but lived in the neighborhood. Wilson told him to take one of the horses and they would ride to the owner's house, and if he would not consent to Hickory riding away on it, it could be returned. He again said all right, and put the bridle on the horse, Wilson telling him to hurry up and get his saddle; that he started to go into the house after his saddle, and when he was about three steps from the porch he heard the fire of a gun, and turning around saw Wilson with a revolver in his hand and smoke coming from it; that he did not run after the first shot, but walked on towards the house, when a second shot was fired just as he was about to enter the front door. That he went into the house and shut the front door, intending to go out through a side room door and run off. When he had gotten about as far as the middle door of the side room he discovered Wilson coming in through the outside door of the side room with his pistol raised at him (indicating the pointing of a pistol); that he then ran to the east side of the front room, got his gun, and went to the front door. The marshal then appeared at the middle door of the side room, exposing himself just enough to shoot, which he did, and that he (the accused) returned the fire, which was followed by further firing between them. The marshal then disappeared from the door and went into the yard and fell down close by the wagon. He (the accused) ran off and remained a half an hour, and on coming back found the marshal dead; he became frightened and did not know what to do, and, indeed, did not know all that he did do; he put the body of the marshal on the wagon, and hauled it about a mile and a half from the house, and then threw it out at the head of the gulch. When he returned after doing this he found the marshal's horse wounded in the knee. He took off the saddle and bridle and hid them, and also the coat which was tied to the saddle and the marshal's pistol and belt. The accused also introduced a witness to the killing, a woman by the name of Ollie Williams, his mistress. She testified to the marshal's coming up to the place where the accused was standing in the yard with the wagon and horses; to the accused starting towards the house. She said that the marshal who was right

by a tree then shot at him; that she did not see how the marshal held his pistol the first time he shot; that the accused was going into the door when the two shots were fired; that the marshal came around to the outside room door with a pistol in his hand, and told her to get out of the way; that she went a quarter of a mile off, and had nothing to do with the moving of the body of the deceased. The accused, moreover, introduced the testimony of a physician who had examined the body of the deceased, and who contradicted the statement that there was a fracture in the skull of the deceased, and said there were two scalp wounds, one on the top of the head and the other in the back; "they had the appearance of some blunt substance striking the head, or the head striking the substance."

The opinion formed by us as to three of the assignments of error will render an examination of the others unnecessary. The three which we will consider are as follows:

"4th. Because the court in commenting on the inculpatory testimony as to the acts of the defendant with reference to the body of the deceased, the alleged killing of the horse, in reference to what is charitable or brutal conduct, gives undue prominence to the inculpatory facts, without summing up all the testimony, as well for as against the defendant in reference to this branch of the case."

"7th. Because the court, a second time in the charge in going over the alleged conduct of the defendant subsequent to the killing, and his conduct in flight, gives undue prominence to the inculpatory facts, and gives them in a way that have the effect of an argument against the defendant, and are not a proper, full summing up of the facts upon this branch of the case."

"11th. Because the court bears upon and gives undue prominence to the flight of defendant, and treats it absolutely as true that defendant concealed the blood, killed the horse, and destroyed the evidence of the alleged killing."

It is contended by the defendant in error that of these assignments the fourth and seventh are not sufficiently specific to merit consideration, because they do not point out the exact

words in the charge of the court complained of.   The assign-
ments are in exactly the same language as were the exceptions
taken during the trial and which the record declares " the
defendant presented at the time."   Whilst it is true that the
assignments do not in terms state the precise language used
by the court, they yet indicate the subject-matter in the charge
to which the exceptions relate with sufficient clearness to en-
able us from a mere inspection of the charge to ascertain the
particular matter referred to.   In considering, when this case
was previously before us, a similar objection to the adequacy
of an exception, we said : " The rule in relation to exceptions
to instructions is that the matter excepted to shall be so
brought to the attention of the court, before the retirement
of the jury, as to enable the judge to correct error, if there
be any, in his instructions to them, and this is also requisite
in order that the appellate tribunal may pass upon the precise
question raised, without being compelled to read the record
to ascertain it."   It is here unquestionable on the very face of
the bill of exceptions that the objections were reserved before
the retirement of the jury, and that the trial court was fully
aware of their import and had the opportunity to make such
corrections, if any, as its judgment may have deemed neces-
sary to prevent the charge from being misunderstood by the
jury.   This is made clear not only by the language of the bill
of exceptions, but also by the charge itself, which contains a
statement by the court, entirely inconsistent with a possibility
of there having been any surprise or misconception.   The
court said :

" There is a little bit of history on that, and I apprehend
the gentlemen won't take any exception to reading from this
book " (the Bible).   " There are a great many exceptions filed
here to almost everything said by the court, but I hope they
won't take any exception to this."

The first comments of the court upon the facts in reference
to concealment (covered by the fourth assignment) and its in-
struction as to the weight to be given the proof on the subject
of the flight of the accused (covered by the eleventh assign-
ment) are so connected in the charge as to cause the examina-

tion of the one to necessarily involve the other. We shall, therefore, examine at the same time the errors complained of in these two assignments.

*First. Errors complained of in the fourth and eleventh assignments.*

The language of the charge to which these assignments relate immediately follows the reference made by the court to the number of exceptions reserved, and is in these words:

" And there is another fact that is so common that I have but to remind you of it, because that which makes up your common knowledge you can use in the investigation of these cases, and it is this: There is no man who has arrived at the years of discretion who has not been so created that he has that in his mind and heart which makes him conscious of an act that is innocent upon his part, and his conduct when connected with an act of that character will be entirely different from the conduct of a man who is conscious of wrong and guilt. In the one case he has nothing to conceal; in the one case his interest and self-protection, his self-security, prompts him to seek investigation, to see to it that it is investigated as soon as possible. This is no new principle. I say it is as old as the days of the first murder. There is a little bit of history on that, and I apprehend the gentlemen won't take any exceptions to reading from this book. There are a great many exceptions filed here, to almost everything said by the court, but I hope they won't take any exceptions to this. There is a little bit of history illustrative of the conduct of men:

" ' And Cain talked with Abel, his brother; and it came to pass, when they were in the field, that Cain rose up against Abel, his brother, and slew him. .

" ' And the Lord said unto Cain, where is Abel, thy brother? And he said, I know not. Am I my brother's keeper?

" ' And He said, what hast thou done? the voice of thy brother's blood crieth unto Me from the ground.'

" ' Am I my brother's keeper?' From that day to the time when Professor Webster murdered his associate and concealed his remains, this concealment of the evidence of crime has been regarded by the law as a proper fact to be taken into consid-

eration as evidence of guilt, as going to show guilt, as going to show that he who does an act is consciously guilty, has conscious knowledge that he is doing wrong, and he, therefore, undertakes to cover up his crime.

"Now, there may be exceptions to the general rule. General as it is, it may have its exceptions, but the question for you to pass upon is whether or not in the first place there were acts upon the part of this defendant, either while acting alone or in concert with others assisting him, that looked towards concealing this act of the killing of Wilson; what these acts were; if they were cruel, if they were unnatural, if they were barbarous, if they were brutal, you still have a right, and it is your duty to take them into consideration. If they were of that character you are to bring to bear your observation in life that men who are conscious of innocence do not usually characterize their conduct after a killing by that sort of acts. You are to see what the acts were. You are to take into account the concealment of this body, the concealment of this horse, the killing of the horse, and the concealing of everything that pertained to that man, the effort to wipe out the blood stains left there where they might be evidences of killing, where they might be discovered afterwards as evidences of the killing. All these things are facts that you must take into account, and not only that, but the law recognizes another proposition as true, and it is, that 'The wicked flee when no man pursueth, but the innocent are as bold as a lion.' That is a self-evident proposition that has been recognized so often by mankind that we can take it as an axiom and apply it in this case. Therefore, the law says that if after a man kills another that he undertakes to fly, if he becomes a fugitive from justice, either by hiding in the jurisdiction, watching out to keep out of the way of the officers, or of going into the Osage country out of the jurisdiction, that you have a right to take that fact into consideration, because it is a fact that does not usually characterize an innocent act."

It is undoubted that acts of concealment by an accused are competent to go to the jury as tending to establish guilt, yet they are not to be considered as alone conclusive, or as creat-

ing a legal presumption of guilt; they are mere circumstances to be considered and weighed in connection with other proof with that caution and circumspection which their inconclusiveness when standing alone require. The rule, on the subject, has had nowhere a clearer and more concise expression than that given by Chief Justice Shaw in the *Webster case*, to which the trial court adverted. *Commonwealth* v. *Webster*, 5 Cush. 295, 316. The learned Chief Justice said: " To the same head may be referred all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations, and to cast suspicion without just cause on other persons; all or any of which tend somewhat to prove consciousness of guilt, and when proved exert an influence against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs. Such was the case often mentioned in the books and cited here yesterday, of a man convicted of the murder of his niece, who had suddenly disappeared under circumstances which created a strong suspicion that she was murdered. He attempted to impose on the court by presenting another girl as the niece. The deception was discovered and naturally operated against him, though the actual appearance of the niece alive afterwards proved conclusively that he was not guilty of the murder."

In *Ryan* v. *The People*, 79 N. Y. 593, considering an objection that the trial court erred in admitting evidence of an attempt to escape from the sheriff, the court said: " There are so many reasons for such conduct, consistent with innocence, that it scarcely comes up to the standard of evidence tending to establish guilt, but this and similar evidence has been allowed upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances. It was not error to admit it." See also *People* v. *Stanley*, 47 California, 113; *People* v. *Forsythe*, 65 California, 101; *State* v. *Gee*, 85 Missouri, 647; *State* v. *Brooks*, 92 Missouri, 542; *Swan* v. *People*, 98 Illinois, 610; *Anderson* v. *State*,

104 Indiana, 467, 472; *Jamison* v. *The People*, 145 Illinois, 357.

The cases which illustrate the rule in various phases are too numerous to review. They are collected in the text-books, and will be found in a note at the foot of c. 14, § 750, of Wharton's Criminal Evidence, 9th ed. The modern English law on the subject is referred to in Wills on Circumstantial Evidence, p. 70, citing the opinion of Mr. Baron Gourney in *Regina* v. *Belaney*, which is thus recapitulated: "By the common law, flight was considered so strong a presumption of guilt, that in cases of treason and felony it carried the forfeiture of the party's goods, whether he were found guilty or acquitted; and the officer always, until the abolition of the practice by statute, called upon the jury, after verdict of acquittal, to state whether the party had fled on account of the charge. These several acts in all their modifications are indications of fear; but it would be harsh and unreasonable invariably to interpret them as indications of moral consciousness, and greater weight has sometimes been attached to them than they have fairly warranted. Doubtless the manly carriage of integrity always commands the respect of mankind, and all tribunals do homage to the great principles from which consistency springs; but it does not follow, because the moral courage and consistency which generally accompany the consciousness of uprightness raise a presumption of innocence, that the converse is always true. Men are differently constituted as respects both animal and moral courage, and fear may spring from causes very different from that of conscious guilt, and every man is therefore entitled to a candid construction of his words and actions, particularly if placed in circumstances of great and unexpected difficulty."

And the same author at p. 80 quotes the observation of Mr. Justice Abbott on a trial for murder where evidence was given proving flight: "A person however conscious of innocence might not have courage to stand a trial, but might, although innocent, think it necessary to consult his safety by flight. It may be," added the learned judge, "a conscious anticipation of punishment for guilt, as the guilty will always anticipate the

consequences, but at the same time it may possibly be according to the frame of mind, merely an inclination to consult his safety by flight rather than stand his trial on a charge so heinous and scandalous as this."

So, again, at p. 88, the same writer says : " So also is the concealment of death by the destruction or attempted destruction of human remains, (a presumption of guilt,) but in this case the presumption of criminality results from the act of concealment rather than from the nature of the means employed, however revolting, which must be regarded only as incidental to the fact of concealment, and not as aggravating the character and tendency of the act itself.   Where a prisoner tried for murder admitted that he had cut off the head and legs from the trunk of a female, and concealed the remains in several places, but alleged that her death had taken place by accident while she was in his company, and that in the alarm of the moment, and to prevent suspicion, he had determined to conceal the death, Lord Chief Justice Tindal told the jury that the concealment of death under such circumstance had always been considered to be a point of the greatest suspicion, but that this evidence must be received with a certain degree of modification, and especially in a case where the feelings might be excited by the singular means of concealment adopted by the prisoner ; that this point of evidence was, therefore, for the consideration of the jury, and it was for them to show how far it was proof of the prisoner's guilt, but the mere general fact of concealment, added the learned judge, is to be considered, and not the circumstances under which it took place."

The text-writers generally state the principle in accordance with the foregoing.

" Few things," says Best on Presumption, p. 323, " distinguish an enlightened system of judicature from a rude and barbarous one more than the manner in which they deal with evidence.   The former weighs testimony, whilst the latter, conscious perhaps of its inability to do so or careless of the consequences of error, at times rejects whole portions *en masse,* and at others converts pieces of evidence into rules of

law by investing with conclusive effect some whose probative force has been found to be in general considerable. If any proof of this were wanted it would be amply supplied by our law with reference to the species of evidence under consideration. Our ancestors, observing that guilty persons usually fled from justice, adopted the hasty conclusion that it was only the guilty who did so, according to the maxim *'fatetur facinus qui fugit judicium,'* so that under the old law, a man who fled to avoid being tried for felony forfeited all his goods even though he were acquitted; and the jury were always charged to inquire not only whether the prisoner were guilty of the offence, but also whether he fled for it, and, if so, what goods and chattels he had." This practice was not formally abolished until the Stats. 7 and 8 Geo. IV, c. 28, sec. 5. "In modern times more correct views have prevailed, and the evasion of or flight from justice seems now nearly reduced to its true place in the administration of the criminal law, namely, that of a circumstance — a fact which it is always of importance to take into consideration, and combined with others may afford strong evidence of guilt, but which, like any other piece of presumptive evidence, it is equally absurd and dangerous to invest with infallibility." And this is quoted with approval in Burrill on Circumstantial Evidence, p. 473. See also Roscoe's Criminal Evidence, 8th American ed. p. 30. Mr. Wharton, in his Criminal Evidence, after referring in a note to the American authorities, states the rule in accordance with the foregoing, and concludes: "The question, it cannot be too often repeated, is simply one of inductive probable reasoning from certain established facts. All the courts can do when such inference is invoked is to say that escape, disguise, and similar acts afford, in connection with other proof, the basis from which guilt may be inferred, but this should be qualified by a general statement of the countervailing conditions, incidental to a comprehensive view of the question."

In a foot note at p. 645 this author collects several marked and peculiar instances where a person had fled who was undoubtedly innocent. One of these instances is this: "Dr.

Thomas Fuller gives the following quaint excuse for running away from London when charged with treason: And if any tax me, as Laban taxed Jacob, 'Wherefore didst thou flee away secretly without taking solemn leave?' I say with Jacob to Laban, 'Because I was afraid.' And that plain dealing patriarch, who could not be accused for purloining a shoe latchet of other men's goods, confessed himself guilty of that awful felony that he 'stole away' for his own safety; seeing truth may sometimes seek corners, not as fearing her cause, but as suspecting her judge."

Thompson on Trials, Tit. 6, c. 69, § 2543, makes this statement: "It is often inaccurately said that the flight of the accused creates a presumption of his guilt, and this presumption is sometimes inadvertently dealt with as though it was a presumption of law. But it belongs to that class of presumptions which are generally classified as presumptions of fact. If it were a presumption of law, the jury would be bound to draw it in every case of flight, and the court might so instruct them; whereas it is merely a *circumstance* tending to increase the probability of the defendant's being the guilty person, which on sound principle is to be weighed by the jury like any other evidentiary circumstance."

Measuring the correctness of the charge now considered by these principles and authorities, it is at once demonstrated to have been plainly erroneous. It magnified and distorted the proving power of the facts on the subject of the concealment; it made the weight of the evidence depend not so much on the concealment itself as on the manner in which it was done. Considering the entire context of the charge, it practically instructed that the facts were, under both divine and human law, conclusive proof of guilt. The statement that no one who was conscious of innocence would resort to concealment was substantially an instruction that all men who did so were necessarily guilty, thus ignoring the fundamental truth, evolved from the experience of mankind, that the innocent do often conceal through fear or other emotion. The legal influence which this language must have exerted on the jury was increased by the subsequent instruction that it was as old

as the first murder for the conduct of an innocent person to be different from that of a guilty one. Putting this language, in connection with the epithets applied to the acts of concealment and the vituperation which the charge contains, it is justly to be deduced that its effect was to instruct that the defendant was a murderer, and, therefore, the only province of the jury was to return a verdict of guilty. It is true that a subsequent portion of the charge refers to the evidence on the subject of concealment as "proper to be taken into consideration, as evidence of guilt," as going to show guilt. But these qualified remarks did not recall the undue weight which the previous language had affixed to the facts to be considered by the jury. The instruction as to the probative weight which the jury should attach to the fact of flight was equally erroneous. It was as follows: "And not only this, but the law recognizes another proposition as true, and it is that, 'the wicked flee, when no man pursueth, but the innocent are as bold as a lion.' That is a self-evident proposition that has been recognized so often by mankind that we can take it as an axiom and apply it to this case." This instruction was tantamount to saying to the jury that flight created a legal presumption of guilt, so strong and so conclusive, that it was the duty of the jury to act on it as an axiomatic truth. On this subject, also, it is true, the charge thus given was apparently afterwards qualified by the statement that the jury had a right to take the fact of flight into consideration, but these words did not correct the illegal charge already given. Indeed, taking the instruction that flight created a legal presumption of guilt with the qualifying words subsequently used, they were both equivalent to saying to the jury that they were, in considering the facts, to give them the weight which, as a matter of law, the court declared they were entitled to have, that is, as creating a legal presumption so well settled as to amount virtually to a conclusive proof of guilt. In *Starr* v. *United States*, 153 U. S. 614, 626, in considering the power of a Federal court to comment in charging a jury on the evidence, we quoted with approval the language of the Supreme Court of Pennsylvania, *Burke* v. *Maxwell*, 81

Penn. St. 139, 153, saying: "When there is sufficient evidence upon a given point to go to a jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided." The charge given in this case violates every rule thus announced. It was neither calm nor was it impartial. It put every deduction which could be drawn against the accused from the proof of concealment and flight, and omitted or obscured the converse aspect. In so doing it deprived the jury of the light requisite to safely use these facts as means to the ascertainment of truth. Nor can it be considered that the language subsequently used corrected the error. "Now (says the charge) there may be exceptions to the general rule. General as it is, it may have its exceptions." But none of the exceptions thus referred to were called to the attention of the jury. Indeed, taking the language of the charge which follows the foregoing words, it must have conveyed, by the strongest possible intimation, the impression to the jury that the case before them was controlled by the general rule previously stated to them by the court, although other cases might be an exception to such rule. For these reasons the judgment must be reversed. In this state of the case it would ordinarily be unnecessary to consider the other assignments. As, however, the case is before us for the second time, and must be remanded for a new trial, the ends of justice will best be subserved by passing on the remaining assignment, that is to say, the eleventh assignment. The portion of the charge to which this assignment is addressed is as follows:

"And then, again, there stands before you a witness who was there, a positive witness, who saw this killing. That witness is the defendant. Bear in mind when you are passing upon this case, that the other witness to it cannot appear before you, he cannot speak to you, except as he speaks by his body as it was found, having been denied even the right of decent burial, by the dead body of his horse by the concealed weapons

and the concealed saddle, by the blood stains that were oblit-erated. He stands before you, although he is in his grave, speaking by the aid of the power and the might of these cir-cumstances in this case. You are to see whether they harmo-nize with this statement of this transaction as given by the defendant, bearing in mind that he stands before you as an interested witness, while these circumstances are of a character that they cannot be bribed, that cannot be dragged into per-jury, they cannot be seduced by bribery into perjury, but they stand as bloody, naked facts before you, speaking for Joseph Wilson and justice, in opposition to and confronting this de-fendant, who stands before you as an interested party; the party who has in this case the largest interest a man can have in any case upon earth. While you are not to disbelieve his evi-dence because of that alone, if you are to do justice, if you are, in the language of counsel, not to be cruel to the country, and to the people of the country who are entitled to legal protec-tion, you are to weigh these facts and see whether they har-monize with his statement when viewed by the light of your intelligence, and when this case is illuminated by such facts, whether it is in harmony with the statements of this interested witness or in contradiction of them."

It is apparent that this part of the charge is replete with the errors which we have already found to exist in the matter which we have already considered. But the instruction con-tains an additional error of so grave a nature that we call attention to it in order to prevent its recurrence. The manner of contrasting the testimony of the accused with the circum-stances connected with the concealment was clearly illegal. The language in which this was done is: "Bearing in mind that he stands before you as an interested witness, while these circumstances are of a character that they cannot be bribed, that cannot be dragged into perjury, they cannot be seduced by bribery into perjury, but they stand as bloody, naked facts before you, speaking for Joseph Wilson and justice, in oppo-sition to and confronting this defendant, who stands before you as an interested party; the party who has in this case the larg-est interest a man can have in any case upon earth." This

contrast thus made could have conveyed but one meaning to the jury, that is, a warning that the testimony of the accused was to be considered by them as of little or no weight because he could be bribed, he could be dragged or seduced into perjury. Such denunciation of the testimony of an accused is without legal warrant. *Allison* v. *United States,* 160 U. S. 203. Indeed, this instruction, besides giving rise to this error, was also, if possible, more markedly wrong from the implications which it conveyed to the jury. It substantially said to them the circumstances as to the killing and concealment cannot be bribed, but the defendant can be; therefore you must consider that these circumstances outweigh his testimony, and it is hence your duty to convict him. In *Starr* v. *United States,* *ubi supra,* speaking through Mr. Chief Justice Fuller, this court called attention to the fact that there were limitations on the power of a Federal court, in commenting on the facts of a case, when instructing a jury, limitations inherent in and implied from the very nature of the judicial office. In *Reynolds* v. *United States,* 98 U. S. 145, 168, speaking through Mr. Chief Justice Waite, this court also said on the same subject: ". . . every appeal by the court to the passions or prejudices of the jury should be promptly rebuked, and . . . . it is the imperative duty of the reviewing court to take care that wrong is not done in this way. . . ." Admonished by the duty resting on us in this regard, we feel obliged to say that the charge which we have considered crosses the line which separates the impartial exercise of the judicial function from the region of partisanship where reason is disturbed, passions excited, and prejudices are necessarily called into play.

*The judgment is reversed, and the case remanded with directions to grant a new trial.*