THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUCAS CARRIÓN ORTIZ, Defendant and Appellant.

No. 7990. Argued May 6, 1940.—Decided June 18, 1940.

*B. Sánchez Castaño* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

· The district attorney filed an information against Manuel Rosario and Lucas Carrión Ortiz, charging them with the crime of robbery, committed as follows:

" . . . on or about November 24, 1938, in the Municipality of Río Piedras, Puerto Rico, which forms part of the judicial district of San Juan, Puerto Rico, they unlawfully, wilfully, maliciously, and feloniously, by means of force and intimidation, took and seized from the person of Portalatín Velázquez, against his will, the sum of $26 in cash and a leather wallet held by and belonging to the said Portalatín Velázquez."

The defendants asked for separate trials. The trial of Carrión was held before a jury on February 28, 1939. The evidence· for the prosecution consisted in the testimony of Portalatín Velázquez, the injured person, and that for the defense in the testimony of Carlos del Valle, Eusebio Carrión, Lucas Carrión, the defendant, and Nicolás Correa. The jury brought in a verdict of guilty and the court rendered judgment sentencing Carrión to two years' imprisonment in the penitentiary at hard labor.

The defendant-appellant in his brief assigns two errors which he argues jointly, to wit: That the evidence is insufficient to support the verdict, inasmuch as it consists only in the testimony of the injured person which was not corroborated, and that the court should have sustained the motion for a new trial.

He states the theories of the prosecution and of himself, thus:

"The theory of the prosecution . . . is that the accused jointly with Víctor Manuel Rosario assaulted Portalatín Velázquez at Stop 37, Hato Rey, Río Piedras, on November 24, 1938, and took from the left rear pocket of his trousers a wallet containing $26.

"On the contrary, the theory of the defense . . . is a denial of those facts and the assertion that the same were invented by Portalatín Velázquez in order to avoid delivering or returning to the owner of the automobile the $26 that belonged to him, as he worked in a public vehicle and had to render an account to said owner."

He goes on to analyze the evidence; states the fact that the other defendant, Rosario, whose trial was held without a jury before another judge, was acquitted; invokes the cases of *People* v. *González,* 13 P.R.R. 34, and *Ayala* v. *United States,* 268 Fed. 296; and requests the reversal of the judgment.

Let us examine the evidence. The testimony of Velázquez is definite. He accused Carrión directly and without hesitation. He stated:

"On November 24, while returning from a trip in a public car when nearing my house, . . . it was about eleven-thirty or twelve o'clock at night or a quarter to twelve . . . I noticed that the street was somewhat in a bad condition . . . and upon reaching the railroad crossing I had to change the speed of the car . . . Then Mr. Carrión, Víctor, in an open manner seized my hand over the steering wheel, thus, pointing a revolver at me on this side and then the other one on the other side grabbed my hand and pulled it out of the window, each pointing a revolver at me, and I could not do anything because the car's motor stopped . . . They took from the left rear pocket of my trousers a wallet containing $26 and then after they had taken the wallet the one standing on the left-hand side stopped and told the other one: 'it is done.' Then the one on the right-hand side turned behind the car and when they both met, they went away and left me there . . . —Q. Who was the one that took the wallet?—A. This man (pointing at the defendant).—Q. Are you sure?—A. Yes, sir.—Q. Did you see him well? A. Yes, sir. Q. Since it was night-time how could you see him?—By the light given

off by the dashboard of the car.—Q. Then can you state whether it was this person or another one, or could you get him confused with another person?—A. Yes, sir, I can state it for sure.—Q. Can you assert that it was the same one?—A. Yes, sir.''

He went on to testify that he knew the defendants ''as passing acquaintances, that he heard their names'' and that he had not had any quarrel with them.

He was then fully, repeatedly, and insistently cross-examined by the defense and he invariably ratified his previous statements. Some jurors questioned him several times. No essential contradiction is observed in his testimony.

The first of the witnesses to testify for the defense was Carlos del Valle who was 16 years of age at the time of the trial.

When asked by the defense whether Velázquez had requested him to testify that the defendant was one of the persons who had assaulted him, he answered ''Yes, sir,'' and on cross-examination by the district attorney he testified as follows:

''Q. Did you state that you had not seen this defendant in that holdup?—A. That I had not seen him.—Q. But you had not stated that?—A. I had stated it here.—Q. Did you state that you saw them in the holdup?—A. No.—Q. Then you never stated that, either here or there, is it not so? You stated that Portalatín called on you and you say that he told you that it was in order to have you say whether or not you had seen them, this boy?—A. Yes, sir.—Q. It is not that Portalatín told you that you should falsely state that they had been the ones participating in the holdup. So that he called on you in order that you should state whether or not you had seen them?—A. Yes, sir.—Q. And you never saw this boy?—A. No.—Q. You stated before me something to the effect that you saw this boy in the house of Víctor Manuel that night, at about 11 o'clock, together.—A. Yes, sir.—Q. In what direction did you see them?—A. I saw them in the house.''

Then the defense intervened followed by the district attorney, and the testimony continued thus:

"Q. Is it not true that Portalatín demanded of you to say that these men held him up?—A. Yes, sir.—Q. And did you not see this people there?—A. No, sir.—The district attorney (addressing the witness): But you have just answered to me that what Portalatín Velázquez asked you was whether you had seen these men holding him up?—A. That is what he asked me.—Mr. Sánchez Castaño (addressing the witness): Did he bring you to testify before the judge between the policeman and himself?—A. Yes, sir.—The district attorney: You never stated to me that you had seen this boy in the holdup, but that you saw them, one of them, coming out of the house at about eleven in that place.—A. Yes, sir. Mr. Sánchez Castaño: But is it not true that Portalatín told you to testify all that?—A. Yes, sir.—Q. And that is not true?—A. No, sir.—Q. Did you not see these men anywhere in that place?—A. No, sir."

The other witness Eusebio Carrión, an uncle of the defendant, testified that at the preliminary investigation before the Policeman Velázquez, he had stated:

" . . . 'I do not know them, I do not know who are those people, because it was nighttime and they were covered and you can not see at night and it was a very dark place' . . . "

He stated that his nephew was a cabinetmaker and that he always earned plenty of money in his work.

The defendant testified that he had worked for several persons whom he named and earned from $14 to $20 weekly, and that on the night of the occurrence he was playing poker near the Estrella Theater with Nicolás Cosme, and when it was nine o'clock he told his friend: "I am leaving because I have to go to bed early." He went into a coffee shop, bought some breakfast supplies for the next day, went on to his house, and retired. He was a friend of the codefendant, although once they had a quarrel, and since that time he has had no dealings with him.

Lastly, Nicolás Correa stated that it was true that on the night of the occurrence, at about nine o'clock, he was playing poker with the defendant.

Is the evidence sufficient? In our judgment, it is. There was only one witness it is true, but according to the law

and the decisions, the testimony of a single witness who is accorded full credit by the jury is sufficient to support a verdict of conviction.

After examining the testimony of Velázquez, we find that the act charged against the defendants is not incredible. It might have occurred as described in said testimony. It is complete. It contains the necessary elements to establish the commission of the crime of robbery and to find the defendant guilty of the same. It all depends on whether it is believed or not.

■ Regarding the theory of the defense, that is, that the testimony of Velázquez was a pure invention in order to avoid paying a certain sum, it might have been so, but the jury was not on that account bound to disregard it, especially since such conduct was not in accord with the normal behaviour of human beings. It can be imagined that an irresponsible individual might simulate a robbery, an assault by unknown persons, in order to avoid the payment of a certain sum, but not that he should directly accuse other human beings, with whom he has had no quarrel, of the perpetration of a robbery. That would be an abnormal, not the ordinary, behaviour.

As to the testimony of Del Valle, his hesitation and the influence exercised on him by the person who happens to question him are evident. It seems only natural that the injured person should investigate whether other persons had witnessed the occurrence in order that they should testify as witnesses. We do not think that from the bare assertions and denials of Del Valle regarding facts set forth in the questions put to him, it can be concluded that the injured person had attempted to induce him to testify as to something of which he really had no knowledge.

The testimony of the last witness for the defense lacks importance. The testimony of the injured person is contradicted in its entirety by the testimony of the defendant, and as to the knowledge of the assailants, by that of his uncle.

The jury adjusted the conflict without there being the slightest suggestion that in so doing they acted under the influence of passion, prejudice, or partiality or that they committed manifest error, and their finding, under such circumstances, must stand.

█ Even if the acquittal of the other defendant in another trial and by a different judge could be taken into account, it would always have to be concluded that such an acquittal would not be conclusive on this case, which must be decided on its own merits.

In the case of *People* v. *González, supra,* relied on by the appellant, it was said in the opinion:

"Upon an examination and careful consideration of the statement of facts, as approved by the lower court, we do not find any evidence whatsoever that the appellant was guilty of the infamous crime against nature.

"The only charge appearing against him is the testimony of the alleged aggrieved party, a boy of 11 years of age, who, if not an idiot, shows signs of a propensity of idiocy. This testimony is in itself contradictory and lacks any legal ground upon which to base a conviction."

The situation there was quite different. The decision has no application herein.

Nor is the other case relied on, namely, *Ayala* v. *United States, supra,* applicable. There the Circuit Court of Appeals for the First Circuit, speaking through Judge Johnson, in so far as pertinent, said:

"While the statute makes it an offense to receive or take lists of drawings or instruments purporting to be lottery tickets which have been brought from a foreign country into the United States, the defendant was not charged with this; and it was an essential part of the government's case that it prove to the satisfaction of the jury, beyond a reasonable doubt, that the defendant had brought or caused such lists and tickets to be brought from Santo Domingo into the island of Porto Rico.

"The only evidence upon which the defendant was convicted was that he was found with these lists and tickets, and that when they

were demanded from him he threw them overboard. There was no direct evidence, as stated by the court, that he had any accomplices aboard the Santiago de Cuba, or that he had been in any way connected with bringing the lists or tickets from Santo Domingo. There was evidence that the steamer had touched at San Juan and Mayagüez, upon the island of Porto Rico, before it came to Ponce, and from the defendant's possession of the lists and the lottery tickets, and his conduct, the inference could as well have been drawn by the jury that the tickets and lists were obtained at San Juan, or Mayagüez, or that the defendant had obtained them in the harbor of Ponce from somebody aboard the steamer Santiago de Cuba, as that he had caused them to be brought from Santo Domingo. While it was the province of the jury to weigh the evidence, and to draw all reasonable inferences that might be drawn therefrom, we do not think that, when inferences as consistent with innocence as with guilt may be drawn from the proven facts, it can be said that there was substantial evidence to support a verdict of guilty. The attempt of the plaintiff to destroy the evidence against himself evidently had great weight with the jury.

"It is pointed out in *Hickory* v. *United States*, 160 U. S. 408, 416, 16 Sup. Ct. 327, 40 L. Ed. 474, that evidence of acts of concealment—'are competent to go to the jury as tending to establish guilt, yet they are not to be considered as alone conclusive, or as creating a legal presumption of guilty; they are mere circumstances, to be considered and weighed in connection with other proof, with that caution and circumspection which their conclusiveness when standing alone require.' " Pp. 299, 300.

The situation herein is distinct. The witness for the prosecution testified that it was the defendant who committed the crime. It is not a question of inferences but of direct charge. If what Portalatín Velázquez stated is true, the defendant is guilty. We have already seen that the jury accepted his testimony as true and that the judgment of acquittal rendered with respect to the other defendant by a different judge and in another trial, is not conclusive in the present case.

In virtue of all the foregoing, we feel constrained to affirm the judgment appealed from.

Mr. Justice Hutchison dissented.