**Michael Andre TODD, Petitioner–Appellant,**

v.

**A.A. LAMARQUE, Warden, Respondent–Appellee.**

No. 05–16503.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2007.

Filed April 19, 2007.

David D. Martin, Esq., Alameda, CA, for Petitioner–Appellant.

Robert R. Anderson, Esq., Harry Joseph Colombo, Esq., Office of the California Attorney General, Sacramento, CA, for Respondent–Appellee.

Before: GOULD and RAWLINSON, Circuit Judges, and COVELLO,* District Judge.

## MEMORANDUM **

This is an appeal from the district court's order denying a petition for a writ of habeas corpus. The appeal is brought pursuant to 28 U.S.C. § 2253.[1] The petitioner-appellant, Michael Todd, contends that the district court erred when it rejected Todd's assertion that a California state trial court coerced a jury into returning a guilty verdict against him during his murder trial.

The issues presented are: 1) whether the court lacks jurisdiction over this matter because Todd filed his notice of appeal forty-nine days after the district court rendered judgment; and 2) whether the district court erred when it concluded that the state appellate court's ruling on direct appeal did not involve an unreasonable application of clearly established federal law.

For the reasons set forth hereinafter, we affirm the decision of the district court.

## FACTS

A review of the record reveals the following material facts which are undisputed except where designated otherwise.

On August 19, 1996, a California state jury convicted the petitioner-appellant, Michael Todd, of murder by torture, false imprisonment by force or menace, and torture. His co-defendant was Kenneth Buffer. At trial, the jury heard testimony that the victim, James Williams, had come to the home of Buffer's girlfriend, Alicia Sullivan, in order to pay a drug-related debt. Sullivan testified that she heard sounds of a struggle coming from her kitchen, where Todd, Buffer, and Williams were out of sight. Over the course of twenty minutes, Sullivan heard Williams screaming in pain, and Todd say, "I know how to make the nigger talk" and "[w]here's my money?" Further, she heard Buffer say, "Okay. Come on, man. Don't put him in too much shock," as Williams was crying and moaning.

Sullivan testified that she saw knives in a skillet heating on the kitchen stove, and that Todd had told her that he had turned on the stove. Later, Sullivan saw that the knives were on the ground, and that Williams appeared to have some swelling around his face. Additionally, she testified that she saw Todd holding a baseball bat.

Buffer also testified at trial, admitting that he had beaten Williams and caused his death. He further testified that Todd had hit Williams in the head with the bat and had burned him with the knives.

---

* The Honorable Alfred V. Covello, Senior United States District Judge for the District of Connecticut, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3.

1. "In a habeas corpus proceeding . . ., the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held." 28 U.S.C. § 2253(a).

Todd largely disputed the testimony of Sullivan and Buffer, and testified that although he was present in the kitchen, he did not hit Williams or even see the knives.

Sullivan eventually left the house and went to the home of a friend, Tracy Yates. Sullivan testified that while crying and screaming, she told Yates, "They're hurting him. Come with me now." Yates testified that Sullivan told her "They're going to kill him over there. Come get him." Another witness testified that Sullivan said to Yates, "They were fighting."

The next day, nearby residents found Williams in a parking lot. Medical personnel treated him for burns and a head injury, but he died a short time later. An autopsy revealed that some of his injuries were consistent with burns caused by a hot knife, while others appeared to be caused by a caustic chemical. Further, Williams suffered brain trauma that appeared to be caused by a blunt object, but probably not a baseball bat. Additionally, Williams had no defensive wounds, possibly indicating that he had not fought back against his assailants.

After three full days of deliberations, the jury reported that they had reached unanimous guilty verdicts on all charges against both defendants, except the murder by torture count against Todd. With respect to this remaining charge, the jury reported that it was deadlocked.

In response, the court asked the jury foreperson how many votes the jury had taken regarding Todd's murder charge, when the last vote was taken, and what the numerical split was. The court repeatedly cautioned the foreperson that it "only need[ed] to know the numerical split, not how people were leaning, but what the split was on the last vote." The split was three to nine.

The court then asked the foreperson whether the jurors had any legal questions that the court could address. The foreperson indicated that they had questions, but that he was unsure whether additional instructions or direction from the court would be of assistance in reaching a unanimous verdict. The court then polled the jurors as to whether additional instructions might help them to reach a verdict. With respect to this question, the jurors were divided, six to six.

The court then raised the possibility of providing comments on the evidence. The court noted, "Now, my comments are only my opinion. They do not bind any juror. You are under no obligation to accept any comments I make. On the other hand, they may be helpful."

When asked by a juror whether the jury could propound questions regarding the evidence, the judge replied, "Well, my original intention had been to comment on evidence that I believe to be significant. But I would be more than willing to read any requests you have and to try to tailor my comments to deal with those issues." He concluded, however, by saying, "I'm not saying that I would necessarily address every issue that you raised, but at least if you told me what it was that was troubling you, then I would know what to focus on."

The court thereafter polled the jurors as to whether its comments on the evidence might be of assistance in reaching an unanimous verdict. Eight jurors thought that hearing comments on the evidence might be helpful. The remaining four jurors either did not think that it would be helpful, or did not know whether it would be helpful.

The court then directed to jurors to return to the deliberation room and propound "written questions concerning either the facts or the law where you would like

to see further direction or comment from me."

Throughout this dialogue between the court and the jurors, Todd made no objection to the court's repeated polling of the jury.

When the jurors returned, they posed the following questions to the court: 1) "Can you aid and abet or conspire [in] parts of or a portion of a continuing crime?"; 2) "Please explain the difference between 'aid and abet' and 'conspiracy'. And especially 'what actions constitute its conclusion'?"; 3) "Please explain the legal difference between withdrawal from aiding and abetting and withdrawal from conspiracy?"; 4) "What is your opinion on aiding and abetting as the evidence pertains to this case?"; and 5) "Does walking away or picking up girlfriend end responsibility?"

In the weekend that followed, the trial judge reduced his comments on the evidence to writing. He then permitted counsel to see his comments. Further, he heard argument regarding defense counsel's objection to the prospect of sharing the comments with the jury. After hearing argument, the judge modified his prepared remarks with some suggestions of counsel, despite defense counsel's general assurances that the comments were "good comments."

When the jurors returned to the courtroom, the court again instructed them on the law of conspiracy, and aiding and abetting, initially re-reading from the original jury charge, but also adding instructions that distinguished between the two doctrines. The court then made the following comments:

> Now, let me turn to my comments on the evidence in this case. My comments are not intended to be exhaustive, that is, I do not intend to discuss all the evidence in this case. In fact, I only intend to discuss two pieces of evidence

which, from my review of the notes, I believe are uncontradicted facts in the case.

> Now, regarding my comments, at this time and for the purpose of assisting you in properly deciding this case, I will comment on the evidence and the testimony and the believability of any witness. My comments are intended to be advisory only and are not binding on you as you must be the exclusive judges of the facts and the believability of the witness. You may disregard any or all of my comments if they do not coincide with your views of the evidence and the believability of the witnesses.

> Before I read you my comments, I want to say that these comments are based on my own notes of the testimony in this case. They are not based on the official record. So my notes are subject to same infirmities as any of your notes. If you have any question about the testimony or the evidence that I'm going to discuss, then I invite you to ask the court reporter to read back those portions of her notes which bear on these issues.

> And finally, by focusing on what I believe to be two uncontradicted facts in the case, I don't intend to suggest that there has not been conflicting testimony on the larger events of which these uncontradicted facts are only a part. But with those comments, I wish to discuss two issues which I believe are of significance after I reviewed your questions.

> Number one. There is no direct or circumstantial evidence that James Williams ever made any attempt to defend or protect himself from the injuries suffered while he was inside the duplex at 6690 Hometown Way on March 28th or March the 29th, 1995. More to the point, he never did anything to defend himself when he was first assaulted in

the kitchen of the duplex. While Kenneth Buffer admits that he initiated this assault, Mr. Todd testified that he was present in the small kitchen when the attack began.

In deciding whether Mr. Todd aided and abetted this attack, you might want to answer the following questions:

A. Did Mr. Todd have a motive to intimidate Mr. Williams at the time that the attack began?

B. Did Mr. Todd's presence in the kitchen cause Williams to decide that he should not defend or protect himself or that efforts to do so would cause Todd to join in the assault on Mr. Williams?

C. If you determine that Mr. Todd was aiding and abetting this initial assault, then what were the natural and probable consequences of that assault?

Turning to the second issue. All witnesses agree that sometime in the afternoon of March 28th, 1995, Alicia Sullivan entered into the home of Tracy Yates and made a statement to Ms. Yates. All witnesses agree that Alicia Sullivan was agitated and/or upset at the time this statement was made. This statement has been recounted in different ways by different witnesses.

Again I'm relying upon my own notes in reading these statements. Erica Yost testified that Alicia said, "Come get him. They're going to kill him." Nakeyota Hawkins testified that Alicia said, "They're going to kill him." Tracy Yates said that the statement was, "They were fighting," and that there was no explanation of who they referred to. Alicia herself remembered the statement as, "They're hurting him. Come with me now."

In deciding whether Mr. Todd was aiding and abetting or participating in the assault at the time Alicia left Hometown Way to drive to the Yates' residence, you might want to answer the following questions:

A. Did Alicia Sullivan make a statement to Tracy Yates which was intended to describe what was taking place when she left 6690 Hometown Way? If so, what was that statement?

If Alicia Sullivan did make a statement, did Alicia exaggerate or lie when she made the statement?

If the statement was made, is the statement an accurate account of who was assaulting James Williams at the time Alicia Sullivan left her house on Hometown Way?

Now, I will give you a copy of two of the new instructions I have read to you. I'm not going to give you a copy of my own comments, because again, they are nothing more than my own comments. I will return to the foreperson the verdict forms on Count one, and I would ask you to return and discuss this matter in the jury deliberation room. Go ahead and follow my bailiff.

At 10:50 a.m., the jury renewed its deliberations. At 12:00 p.m., the jury returned to the courtroom, and the foreperson announced that they had reached a unanimous guilty verdict on the remaining murder count.

Todd brought a direct appeal to the Court of Appeal of the State of California, contending that the trial court's polling of the jury and comments on the evidence coerced the jury into returning a guilty verdict in violation of the United States Constitution. "Having considered the totality of the circumstances," the state appellate court upheld the conviction. The state appellate court concluded that "the court's inquiry into the numerical split was not coercive ... and the court's comments on the evidence satisfied constitutional standards."

Todd then filed a habeas petition in United States District Court for the Eastern District of California. The district court denied the petition, adopting in full the findings and recommendations of a magistrate judge "that the decision of the California Court of Appeal rejecting the petitioner's claim of judicial coercion is not contrary to or an unreasonable application of the federal due process standards ... and should not be set aside."

On May 27, 2005, the district court rendered judgment for the respondent warden. On July 15, 2005, proceeding *pro se*, Todd filed a "request for a[sic] extension to file for a certificate of appealability" contending that there was good cause to grant an extension because he was frequently under "lock-down" due to staffing shortages at the prison. On August 2, 2005, relying on Todd's representations regarding the conditions at the prison, the district court concluded that there was good cause to grant an extension of time. Further, the district court construed Todd's last filing both as a motion for permission to file a late appeal, and as a notice of appeal itself.

## STANDARD OF REVIEW

The court reviews "for abuse of discretion a district court's decision to grant or deny a motion for an extension of time to file a notice of appeal." *Pincay v. Andrews*, 389 F.3d 853, 858 (9th Cir.2004).

"A district court's decision to grant or to deny a petition for habeas corpus is reviewed de novo." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.2003). With respect to "any claim that was adjudicated on the merits in State court proceedings," the court cannot grant an application for a writ of habeas corpus unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"In order for a federal court to find a state court's application of ... precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (internal quotations omitted). "The state court's application must have been objectively unreasonable." *Id.* at 520–21, 123 S.Ct. 2527 (internal quotations omitted).

## DISCUSSION

### I. Jurisdiction

■ As a preliminary matter, the respondent-appellee contends that this court lacks jurisdiction over this action because Todd failed to file a timely notice of appeal. *See Andrade v. Attorney General*, 270 F.3d 743, 750 (9th Cir.2001) (noting that a "timely notice of appeal is mandatory and jurisdictional"), *rev'd on other grounds* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). We disagree.

Although litigants must file a notice of appeal within thirty days of the district court's rendering of judgment, Fed. R.App. P. 4(a)(1)(A), "[t]he district court may extend the time to file a notice of appeal if: (i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and (ii) ... that party shows excusable neglect or good cause." Fed. R.App. P. 4(a)(5)(A).

On July 15, 2005, forty-nine days after the district court rendered judgment, Todd

requested an extension of time "to file a certificate of appealability." This motion was timely, as Todd filed it less than thirty days after the initial deadline for filing a notice of appeal. *See* Fed. R.App. P. 4(a)(5)(A). The district court granted this motion on the grounds that there was "good cause to extend the time for filing a notice of appeal," relying specifically on Todd's representations that he was frequently under "lock-down" due to staffing shortages at the prison. The respondent-appellee does not challenge this conclusion, or contend that the district court abused its discretion in granting the motion. As such, Todd filed his notice of appeal pursuant to a lawful extension of time. The notice of appeal was therefore timely, and accordingly, we have jurisdiction over this matter.

## II. Jury Coercion

■ Todd argues that he is entitled to habeas relief because the state appellate court's ruling upholding his conviction was based on an "unreasonable application of established federal law." Specifically, he contends that the state appellate court evaluated the actions of the trial court in isolation rather than "in its context and under all the circumstances" as required by *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The actions to which Todd refers include the trial court's: 1) polling of the jury; 2) invitation to the jury to propound questions to the trial court; 3) failure to adequately explain the manner in which the trial court intended to respond to those questions; and 4) comments on the evidence.

The respondent-appellee responds that Todd is not entitled to relief "because the trial court did not coerce the jury into returning a verdict...."

While this assertion may be correct, we need not reach the question of whether the trial court actually coerced the jury. In order for Todd to be entitled to habeas relief, the California Court of Appeal's ruling must have "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States...." 28 U.S.C. § 2254(d)(1). Because we conclude that the state appellate court did not so err, we affirm.

Todd concedes that there are no *per se* rules rooted in the United States Constitution that would require the reversal of a conviction where a trial court polled a jury, gave a supplemental jury instruction, or commented upon the evidence in a case. While the Supreme Court has banned the practice of polling juries in federal court, *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926), it did so pursuant to its supervisory authority over the federal judiciary, and not because of any particular constitutional imperative. *Lowenfield v. Phelps*, 484 U.S. 231, 239–40, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). As such, the practice is generally permissible in state court proceedings. *See id.* Likewise, the Supreme Court has noted that the "use of a supplemental charge has long been sanctioned." *Id.* at 237, 108 S.Ct. 546. Further, the Supreme Court has long held that it is generally permissible for judges to comment upon the evidence in a case, so long as they do so with "great care ... as not to mislead ... [or] be one-sided." *Hickory v. United States*, 160 U.S. 408, 423, 16 S.Ct. 327, 40 L.Ed. 474 (1896) (citing *Burke v. Maxwell*, 81 Penn. St. 139, 153 (Pa.1876)).

Nevertheless, Todd suggests that the trial court's use of all of these practices in a single case coerced the jury into finding him guilty of murder. In support of this notion, he cites a single case that constitutes clearly established federal law for

the purpose of this appeal, *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the Supreme Court heard an appeal of a denial of a habeas petition. *Id.* at 231, 108 S.Ct. 546. The appellant argued that a state trial court denied him a fair trial when it twice polled deadlocked jurors as to whether further deliberations might result in a verdict, and instructed them to continue their deliberations. *Id.* at 234–41, 108 S.Ct. 546. The Supreme Court noted generally that jury polling is fraught with "potential dangers" and is "generally coercive." *Id.* at 239–40, 108 S.Ct. 546. Nevertheless, having considered the challenged conduct "in its context and under all the circumstances" the Court upheld the conviction. *Lowenfield,* 484 U.S. at 237–41, 108 S.Ct. 546. The Supreme Court emphasized that the trial court polled the jurors to determine "how they stood on the question of whether further deliberations might assist them in returning a verdict[,]" rather than "how they stood on the merits of the verdict...." *Id.* at 240, 108 S.Ct. 546. Further, the Supreme Court noted that although the defense attorney moved for a mistrial when it appeared that the jury was deadlocked, he did not object to either the trial court polling the jury or providing the jury with a supplemental charge. *Id.* This failure to object indicated that there was no coercion evident to those present at the trial. *Id.*

In the present case, "[h]aving considered the totality of the circumstances," the state appellate court concluded that the trial court's actions did not violate the United States Constitution. An examination of the facts in the record reveals that this conclusion was reasonable. For example, when the jury reported that it was deadlocked and the trial court set out to poll the jury, it specifically and repeatedly told the foreperson not to reveal "how people were leaning," indicating that although the trial court was interested in

reaching a verdict, it was not interested in any particular verdict. Similarly, when the trial court inquired whether additional instructions or comments upon the evidence might bring a resolution to the case, the court asked simply whether doing so might help "to reach a unanimous verdict." These acts are consistent with the Supreme Court's previous approval of the polling of jurors to determine "how they stood on the question of whether further deliberations might assist them in returning a verdict[,]" rather than "how they stood on the merits of the verdict...." *Lowenfield,* 484 U.S. at 240, 108 S.Ct. 546. Moreover, as the Supreme Court has noted, the defendant's failure to object to such polling indicates a lack of coercion evident to those present at the trial. *See id.*

Additionally, the trial court took numerous precautions to avoid unlawfully swaying the jury. Before even asking whether comments on the evidence might be useful, the trial court made clear that "my comments are only my opinion. They do not bind any juror. You are under no obligation to accept any comments I make." Further, although the trial court explained that it would try to "tailor [its] comments to deal with those issues" that the jurors had, the court was clear that it would not "necessarily address every issue that you raised...."

Before commenting on the evidence, the trial court re-read various instructions that addressed the questions posed by the jurors. When the court eventually did comment on the evidence, it did so orally, and did not provide the jury with a written copy of the remarks, as it had done with the jury instructions. Later, the trial court reiterated that it was not giving the jury a copy of his remarks "because they are nothing more than my comments." Further, the court specified that the "comments are not intended to be exhaustive," and that the court did not "intend to dis-

cuss all the evidence in the case." Instead, the trial court made clear that it was only commenting on "uncontradicted facts in the case," and conceded that there had been conflicting testimony "on the larger events of which these uncontradicted facts [were] only a part." Again, the trial court cautioned that the "comments are intended to be advisory only and are not binding on you as you must be the exclusive judges of the facts and of the believability of the witnesses." Further, the court noted that they could "disregard any or all of [his] comments" if they did not coincide with the jurors' views on the evidence. Additionally, the trial court made clear that the comments were based on its notes, and not the official record. As such, the court suggested that its notes were no more accurate than the jurors' own notes. Moreover, the court invited the jurors "to ask the court reporter to read back those portions of her notes which bear on those issues." Thereafter, the trial court identified for the jury several uncontested facts, and then intimated that these facts could possibly satisfy some of the legal elements of aiding and abetting.

These comments can not fairly be described as breaching the limits established by the Supreme Court for federal judges that comment upon evidence. Namely, when commenting upon the evidence to a jury, a federal judge "may analyze and dissect the evidence, but he may not either distort it or add to it." *Quercia v. United States*, 289 U.S. 466, 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) (overturning a federal

conviction where the trial judge noted that the defendant "wiped his hands during his testimony" which in the judge's opinion was "a curious thing, [and] ... almost always an indication of lying."); *see also Hickory*, 160 U.S. at 424, 16 S.Ct. 327 (overturning a federal conviction where the trial judge instructed the jury regarding the defendant's credibility as a witness by noting that the defendant "stands before you as an interested party; the party who has in this case the largest interest a man can have in any case upon earth").

Ultimately, in order for Todd to be entitled to habeas relief, the state appellate court's decision upholding Todd's conviction "must have been more than incorrect or erroneous." *Wiggins*, 539 U.S. at 520, 123 S.Ct. 2527 (internal quotations omitted). "The state court's application [of federal law] must have been 'objectively unreasonable.'" *Id.* at 520–21, 123 S.Ct. 2527 (internal quotations omitted). Taking the facts in the record as a whole, we concluded that it was not objectively unreasonable for the state appellate court to hold that there was no jury coercion in this case. As such, Todd is not entitled to habeas relief.[2]

**AFFIRMED.**

RAWLINSON, Circuit Judge, concurring:

I concur in the result.

---

**2.** Todd also argues that the state appellate court's ruling was erroneous because it was "based on an unreasonable determination of the facts" citing 28 U.S.C. § 2254(d)(2). As framed by Todd, this argument is unavailing because it is duplicative of his contention that the state appellate court reached an unreasonable conclusion. Rather than contesting the state appellate court's reliance on any particular factual determinations, he essen-

tially again argues that the state appellate court unreasonably applied federal law by emphasizing the wrong facts in its analysis. Moreover, Todd appears to have abandoned this argument by suggesting in his reply brief that "there were no factual findings in this case—there are no factual disputes." Further, "[t]here were no factual determinations in this case...." We therefore conclude that Todd is not entitled to relief on this basis.