UNITED STATES of America
v.
Leonard T. ROBINSON, Appellant.

UNITED STATES of America
v.
James E. McCAFFITY, Appellant.

UNITED STATES of America
v.
Louis JOHNSON, Appellant.
Nos. 24809–24811.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 22, 1971.

Decided March 7, 1973.

Louis P. Robbins, Washington, D. C., with whom Nathan H. Wasser, Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry and William H. Collins, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellants were found guilty of second-degree murder, submitted under a revised indictment as a lesser included offense to a felony-murder charge, and of armed robbery.[1] This appeal, from judgments sentencing each appellant to concurrent terms of six to twenty years' imprisonment, raises questions as to (1) the trial judge's refusal to permit the veniremen's attitudes toward self-defense to be explored on *voir dire*; (2) the court's instructions as to (a) aiding and abetting, (b) lesser included homicide offenses, and (c) evidence of flight; and (3) the court's refusal to require amendment of the robbery count to set forth the requisite intent. Finding no prejudicial error, we affirm.[2]

1. The indictment charged: count 1—first degree, felony murder (D.C.Code § 22–2401); count 2—second degree murder (D.C.Code § 22–2403); count 3—armed robbery (D.C.Code § 22–3202); count 4—robbery (D.C.Code § 22–2901). Prior to submission to the jury, the indictment was retyped to omit count 2. See note 14, *infra*, and accompanying text. Count 5, which charged Robinson, individually with carrying a concealed weapon (D.C. Code § 22–3204) was dismissed on the Government's motion at the close of the prosecution's case in chief.

2. Oral argument was heard on October 22, 1971. A *sua sponte* order was issued on November 29, 1971, holding this case in abeyance pending *en banc* decisions in United States v. Heinlein, No. 23,226; United States v. Walker, No. 23,227; and United States v. Walker, No. 23,228. Subsequent reflection convinced us that the questions raised in the instructions as to aiding and abetting in the context of a felony-murder conviction present an issue distinct from that raised in *Heinlein-Walker*. On September 13, 1972, we vacated our order of November 29, 1971.

## I. BACKGROUND

This case arose from the shooting of, and taking money from, one Alvin Robinson (hereinafter the deceased).[3] The highlights of the prosecution and defense cases will suffice.

### 1. *The Government's case.*

Appellants, all residents of Baltimore, came to Washington on Sunday afternoon, February 8, 1970. They had previously been unacquainted with the decedent and met him under entirely innocent circumstances in the company of mutual friends, seven women from New York. An impromptu party developed at a house on Blaine Street. The appellants, the deceased, his girl friend Catherine Gross, and others spent a convivial evening together in casual conversation, drinking and dancing.

In jovial spirits, deceased boastfully flashed a large roll of money ("teasing the girls"), with at least a couple of hundred dollar bills. The roll bulged noticeably in his trousers pocket. McCaffity may have had an opportunity to see the money at close range when he and the deceased left to buy something to drink.

Appellant Johnson remarked to Rhetta Wright, "You see this fellow over there? . . . . He has a roll and I'm going to get it." But he pointed to a group of men and she could not swear the statement referred to the decedent. McCaffity asked for and received the decedent's home address and telephone number.

Toward midnight, Miss Gross felt decedent was "kind of high" and they should leave. William T. McDowell, Jr., an off-duty D.C. policeman and friend of the decedent, offered to drive them home. McCaffity asked for directions to the Baltimore-Washington Parkway, and McDowell said that he would show him the way.

Three cars left the Blaine Street house. Deceased and Miss Gross were in the first car, driven by McDowell.[4] In the second auto were appellant McCaffity and Miss Wright. In the third were appellants Robinson and Johnson. After McDowell led the appellants to the entrance ramp and waved them on to the Parkway, he drove to the deceased's home on Jay Street, and escorted deceased and Miss Gross inside. Leaving the house, he was surprised to see appellants' cars parked outside. McCaffity told McDowell that they had decided to take Miss Wright to her sister's home on Spring Place and got lost. McDowell gave appellants directions to that address and returned to Blaine Street.

Appellants then drove Miss Wright to the Spring Place home; on letting her off, they announced they were returning to Baltimore; instead they drove back to decedent's home on Jay Street.

Miss Gross testified that after Officer McDowell dropped them off, she helped the deceased remove his trousers (containing the money), placed them on the living room sofa and took deceased to an upstairs bedroom where deceased went to bed. Soon after, she heard a persistent knock at the front door. She opened it, and the three appellants "pushed their way in." At this point deceased, in his underwear, came downstairs, asked Miss Gross where his trousers were, and told her to go back upstairs. A few moments later, she heard him cry out for her to "Get the police!" She ran down the stairs toward the front door. In the vestibule, she was shoved to the floor by appellant Johnson, who ran out the door with deceased's trousers. She looked up and saw appellants McCaffity and Robinson confronting the deceased. McCaffity was pointing a revolver at the decedent, unarmed, about six feet away. "[I]f you are not going to use the gun, I will." Saying that, Robinson "took the pistol out of [Mc-

---

3. Use of the term "deceased" or "decedent" for Alvin Robinson will avoid confusion with appellant Leonard T. Robinson.

4. McDowell was accompanied by a Miss Kennedo.

Caffity's] hand" and shot deceased. Miss Gross ran across the street to the home of a neighbor and telephoned the police.

During their investigation, the police obtained a .32 calibre pistol from McCaffity's wife.[5] Miss Gross testified it resembled the gun from which the fatal shot had been fired.[6] McCaffity later admitted the weapon belonged to him.

Three days later, all three appellants were arrested at a motel in New York City. Robinson was carrying about $200 in cash, including a $100 bill.

### 2. The defense.

Each of the appellants took the stand. According to their version, which contradicted the account of the prosecution's witnesses, deceased had boasted at the Blaine Street party of his abilities as a dice shooter and suggested they come to his home for a crap game after the party. When they arrived, he invited them in and, after sending Miss Gross upstairs picked up his trousers from the sofa. He said the other players would arrive shortly. Appellant Robinson began to "warm up" by rolling a pair of dice. Deceased accused him of using loaded dice. McCaffity stated that he observed deceased take a gun from a desk in the next room, and put it in the pants pocket. The deceased then confronted McCaffity, reiterated his accusation, and, without provocation, struck him in the face. A struggle ensued. Fearing that deceased would use the pistol, and remembering having heard deceased say that he had once shot a woman, McCaffity grabbed the pants and ran for the door. He heard deceased shouting for Miss Gross to "Get the .45 [and] shoot the s. o. b." He collided with Miss Gross on his way to the door, knocking her down, ran outside,

and threw the trousers into his car. The fight between Robinson and deceased continued, and Robinson fell against some furniture and was knocked unconscious.

Appellants testified that, prior to the Blaine Street party, McCaffity had removed the .32 calibre revolver from the glove compartment of his car to avoid exciting the apprehensions of his lady passengers and had given it to Johnson, who carried it all day in the pocket of his trench coat. Johnson asserts that as the fight went on he ran outside, saw that McCaffity had already left the house, reasoned that Robinson must still be inside, and turned back toward the house. He saw the deceased by the front door, holding what he believed to be a gun in his hand, drew McCaffity's pistol from his pocket, fired a blind shot at the deceased, and ran to his car.

Robinson stated that, when he regained consciousness, he left the house. On his way out, he saw deceased lying face down, and six inches away a .38 calibre revolver, which he picked up as he ran to the car. He reassured Johnson that deceased was still moving, and was probably only shot in the leg.

Appellants drove back to Baltimore. McCaffity, who was alone in one car, testified he had no idea deceased had been shot until the next morning when Robinson and Johnson met him, returned his own pistol, and gave him the gun Robinson purportedly took from the deceased's porch. He admitted discovering on his way home that the trousers he took from the deceased did not contain a pistol, but instead about a thousand dollars. He never told the others of this, and gave the money to his wife. Appellants were afraid to check out in Washington what happened to deceased and

---

5. Mrs. McCaffity also surrendered a .38 calibre pistol. The Government's evidence did not connect the .38 with the crime. But appellant Robinson testified he had found it lying next to the body of deceased and had given it to McCaffity the morning after the shooting.

6. The slug removed from the body of the decedent was too mutilated to permit positive identification by microscope comparison, but in all gross physical characteristics it was like the five live cartridges found in McCaffity's .32 pistol. It could not have been fired from a .38 calibre weapon.

went to New York, where Miss Wright lived, to find out. Their testimony tended to account for the money in their possession at arrest.

## II. ISSUES RAISED ON THIS APPEAL

A. *Conduct of* voir dire.

Appellants' counsel submitted to the court a list of proposed questions to be put to veniremen during *voir dire* examination. The the trial court refused to include two questions, proposed by McCaffity's counsel, relating to self-defense.[7]

■ Pursuant to Rule 24(a), Fed.R. Crim.P., the trial judge is vested with "broad discretion" in the conduct of *voir dire*—both as to the mode and manner of proceeding, United States v. Bryant, 153 U.S.App.D.C. 72, 471 F.2d 1040 (1972), cert. denied, 409 U.S. 1112, 93 S. Ct. 923, 34 L.Ed.2d 693 (1973), and as to the range of questions put to the prospective jurors, Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); Grogan v. United States, 394 F.2d 287 (5th Cir., 1967), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 100 (1968). The exercise of this discretion is "subject to the essential demands of fairness." Aldridge v. United States, 283 U.S. 308, 310, 51 S. Ct. 470, 471, 75 L.Ed. 1054 (1931); Brown v. United States, 119 U.S.App.D. C. 203, 338 F.2d 543 (1964); Sellers v. United States, 106 U.S.App.D.C. 209, 271 F.2d 475 (1959). But absent abuse of his broad discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial judge's rulings as to the scope and content of *voir dire* will not be disturbed on appeal. Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100

L.Ed. 1487 (1956); Haslam v. United States, 431 F.2d 362 (9th Cir., 1970), aff'd on rhg., 437 F.2d 955, cert. denied, 402 U.S. 976, 91 S.Ct. 1860, 29 L.Ed.2d 142 (1971).

In refusing to question jurors regarding self-defense, the District Judge stated, "I don't want to inject any legal defenses into a case before the jury has heard any evidence." The Government argues, in support of this ruling, that at this point of the case appellants' defense was no more than a theory, and conceivably the evidence actually offered might not have sufficed to justify an instruction on self-defense. And, it might be argued, the suggestion of the issue on *voir dire* might lead the jury to speculate along impermissible lines during their deliberations and influence their perception of the evidence as it unfolds at trial.

■ This approach does not, on balance, commend itself to the court. If the issue is one on which jury attitudes should be probed on *voir dire* to assure a fair trial by an impartial jury, this strength of our system should not be scuttled merely because, on relatively infrequent occasions, a planned defense is unexpectedly foreclosed or abandoned. And the problem can be contained by accompanying the *voir dire* with a cautionary instruction explaining the purpose of the questioning and informing the jurors that the matters discussed are not in evidence and are not to be considered during their deliberations. This approach is fortified by the right of the defense counsel to present his approach to the jury before trial, in the opening statement.

■ Nevertheless, we do not discern prejudice to substantial rights from the denial of these questions. The defense must be given a full and fair op-

---

7. The proposed questions were (R. at 16):
   Do any members of the prospective jury panel feel that self-defense does not justify the wilful taking of a human life?
   Do any members of the prospective jury panel feel that they would be unable to follow the Court's instructions on self-

defense because of their personal views on the subject?
   Possible objections going to the form of the questions were not the basis of the trial judge's ruling, nor were they raised on this appeal.

portunity to expose bias or prejudice on the part of the veniremen. Morford v. United States, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950). The possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones,[8] or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact.[9] In a case involving such sentiment, the trial court must take it into account and govern the voir dire accordingly. Still other forms of bias and distorting influence have become evident, through experience with juries, and have come to be recognized as a proper subject for the voir dire. An example is the problem that jurors tend to attach disproportionate weight to the testimony of police of-

ficers. See Brown v. United States, supra; Sellers v. United States, supra.

When the matter sought to be explored on voir dire does not relate to one of those recognized classes, it is incumbent upon the proponent to lay a foundation for his question by showing that it · is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp. The appellants made no such effort at the time the question was submitted to the trial judge; nor did they present before this court any material tending to show that prejudice against a claim of self-defense was likely to be encountered in the community from which the veniremen were drawn.[10] Absent such a showing, we find no prejudice to the rights of the accused.[11]

The court's instructions as to the law of self-defense were clear and complete. We have no basis for supposing that ju-

---

8. Aldridge v. United States, supra; King v. United States, 124 U.S.App.D.C. 138, 362 F.2d 968 (1966).

    In Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46, the Supreme Court recently noted the special constitutional status of voir dire questions designed to ferret out racial bias. Reversing the petitioner's conviction, the Court held refusal to permit interrogation on the specific issue of racial bias violated the accused's Fourteenth Amendment rights to due process. It went on to uphold, however, the trial court's exclusion of questions concerning possible prejudice against persons who wore beards, as did the accused. In explicating this distinction, the Court stated:

    While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, this is the beginning and not the end of the inquiry as to whether the Fourteenth Amendment required the trial judge to interrogate the prospective jurors about such possible prejudice. Given the traditionally broad discretion accorded to the trial judge in conducting voir dire . . . and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional

    rights were violated when the trial judge refused to put this question.
    409 U.S. 524, 527, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (citation omitted, emphasis supplied).

9. These would, for example, include prejudice against: wagering, Lurding v. United States, 179 F.2d 419 (6th Cir., 1950); see United States v. Clancy, 276 F.2d 617, 632 (7th Cir., 1960), rev'd on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); the use of intoxicants, State v. Miller, 60 Idaho 79, 88 P.2d 526 (1939); see Gonzales v. State, 169 Tex.Cr.R. 49, 331 S.W.2d 748 (1960); one who intends to testify that he had lied to another, United States v. Napoleone, 349 F.2d 350 (3d Cir. 1965); a member of a religious minority, United States v. Daily, 139 F.2d 7 (7th Cir., 1943).

10. Indeed, the pioneering social research into the ethos and behavior of jurors shows that, in many situations, the typical jury take a rather charitable view toward a plea of self-defense, tending to interpret the evidence adduced in a manner distinctly favorable to the accused. H. Kalven & H. Zeisel, The American Jury, 221–241, 407–408 (1966).

11. Although voir dire as to self-defense was referred to as a defense right in Webb

rors might in any way be hestiant to abide by their instructions. The trial court's conduct of *voir dire* presents no reversible error.[12]

### B. *The Instruction as to Aiding and Abetting.*

The instruction given on aiding and abetting was that generally used in this District[13] and informed the jury that the two non-shooting defendants should not be found guilty unless their individual participation in the offense was found.

■ Appellants now argue that the charge was inadequate in the setting of this case. They say that the evidence only showed complicity in the robbery, and when the jury acquitted of felony-murder they necessarily found the homicide did not take place during the commission of the robbery. The jury should have been instructed, say appellants, that in making such a determination they should acquit unless the Government proved aiding and abetting in the

homicide as a specific crime, separate and apart from the robbery.

The issue cannot be addressed, as appellants' counsel do, solely in terms of logic. The only evidence linking the non-shooters to the homicide was that which linked them to the robbery. Yet all three defendants requested that the issue of second degree murder be put to the jury as a lesser included offense of felony-murder.[14] Although the rationale of lesser included offenses is a developing one,[15] its application to the homicide offenses was thoroughly explored in Fuller v. United States[16] and requires no further elaboration. Under *Fuller*, the appellants were entitled to their motion that the jury be instructed to consider second degree murder as a lesser included offense, and the trial court acted properly in acceding to their request.

■ We need not now concern ourselves with a question of prejudice that might arise in a case where defendant resisted a lesser-included offense instruction as incompatible with the evidence.[17] Certainly the evidence ad-

---

v. Commonwealth, 314 S.W.2d 543 (Ky., 1958), the setting was one of patricide, which obviously makes a profound difference in terms of jury sentiment. Also, the court reversed a manslaughter conviction for erroneous admission of evidence, and the opinion identified its statements as to *voir dire* as dictum.

12. In all other respects, the trial judge's questions to discover possible prejudice on the part of the veniremen were thorough and searching. Thus, for example, the court inquired whether any of the prospective jurors or any of their close relatives had ever been victims of violent crime, whether any of them worked in an establishment that had been robbed, and whether any of them would be prejudiced against an individual merely because he had been shown to have owned or carried fire arms (Tr. A–I: 20–79).

13. District of Columbia Bar Ass'n, Young Lawyer's Section, Criminal Jury Instructions for the District of Columbia, Instruction 4.02 at 82 (2d ed., 1972). *See id.*, Instruction 47 at 27 (1st ed., 1966).

14. (Leon) Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (1962) ;

Kitchen v. United States, 95 U.S.App.D.C. 277, 221 F.2d 832 (1955) ; cert. denied, 357 U.S. 928, 78 S.Ct. 1378, 2 L.Ed.2d 1374 (1958). *See* Fuller v. United States, 132 U.S.App.D.C. 264, 294, 407 F.2d 1199, 1229 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969).

15. *Compare* (Wm.) Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961) (en banc), cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962), *with* United States v. Huff, 143 U.S.App.D.C. 163, 442 F.2d 885 (1971) *and* United States v. Whitaker, 144 U.S.App.D.C. 344, 447 F.2d 314 (1971).

16. 132 U.S.App.D.C. 264, 407 F.2d 1199 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969).

17. *Compare* Green v. United States, 95 U.S.App.D.C. 45, 218 F.2d 856 (1955) ; (Wm.) Coleman v. United States, *supra.* Nor need we concern ourselves at this juncture with the vitality of *Coleman* in the light of *Fuller* (en banc) and other subsequent decisions, see fn. 15, *supra.*

duced at trial was sufficient to support a second-degree verdict, as appears from the so-called "Sheriff Road Robbery cases." [18] There five men stole a car and parked it next to a store near closing time. When the owner and his wife left their store, three of the defendants left the car and confronted them, one grabbing the wife's purse. At this point another defendant, carrying a pistol, became involved in a scuffle with the store owners; the pistol discharged, fatally wounding the store proprietor. The jury acquitted of felony-murder, but convicted of robbery and second degree murder. This court held that the non-shooting accomplices could properly be convicted of second degree murder, observing "The jury could reasonably regard the shooting as incidental to the common design of robbery." [19]

As to appellants' contention that the acquittal of felony-murder necessarily and logically establishes that the robbery and the homicide were severable events, so that complicity in the robbery could not support responsibility for the homicide, we must advert not only to the precedent just discussed, but to the rule that requires affirmance of a conviction of a charge supported by the evidence even where that is logically inconsistent with the same jury's acquittal of another charge. E. g., Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Fox, 140 U.S. App.D.C. 129, 433 F.2d 1235 (1970), and cases cited therein at n. 21. The jury may have merely exercised a clemency that is its prerogative without regard to logic. Appeal to such clemency may, indeed, well have accounted for the request by each defendant for an instruction that the jury was entitled to bring in a verdict of second degree murder as a lesser included offense. The trial judge's instruction on aiding and abetting was in accord with precedent,[20] and stressed the core element of the need to apply the principles of aiding and abetting separately as to each defendant and each offense.[21] We discern no reversible error.

18. (Leon) Jackson, (Chas.) Coleman, Tatum & Dykes v. United States, reported seriatim at 114 U.S.App.D.C. 181–189, 313 F.2d 572–580 (1962).

19. (Chas.) Coleman v. United States, id. at 187, 313 F.2d at 578.

Although the evidence submitted is the gauge against which the propriety of lesser included offense instructions must be measured, United States v. Comer, 137 U.S.App.D.C. 214, 218, 421 F.2d 1149, 1153 (1970), the quantum of proof needed to justify giving the instruction is but slight, Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); United States v. Huff, 143 U.S. App.D.C. 163, 442 F.2d 885 (1971). In addition,

[t]he jury is not confined in its findings to matters that are directly set forth in testimony but may base an inference of lesser offense on a "reconstruction that is fairly inferable" from the evidence, gleaned perhaps by putting together some items from one witness, some from another, and some from the jury's own experience and sense of probabilities. Id. at 168, 442 F.2d at 890,

quoting Belton v. United States, 127 U.S. App.D.C. 201, 207, 382 F.2d 150, 156 (1967).

20. See United States v. Lumpkin, 145 U.S. App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971) and cases therein cited.

21. When two or more persons are alleged to be involved in the commission of a crime, there are certain principles of law which should apply and which you should keep in mind in determining the guilt in innocence of each of the particular defendants on trial before you. (Tr. VII: 197–98)

\* \* \* \* \*

Now, these instructions that I have just given you as to aiding and abetting and acting in concert apply to each and every one of the counts in this indictment which you are going to consider, and you should keep the principles of aiding and abetting in your minds as you consider each individual count. (Tr. VII: 199)

The impact of these instructions was heightened by the trial court's charge as to the manner of deliberation:

You should give separate consideration and render separate verdicts with respect to each defendant as to each count. Each defendant is entitled to have his guilt or innocence as to each of the crimes charged determined from the evidence which applies to him as if he were being tried alone. (Tr. VII: 220–21)

## C.  The Flight Instruction.

■ The trial court instructed the jury, in part, "Flight or running away does not prove guilt . . ." (Tr. VII: 216). Appellants protest the failure to give their requested instruction, which used the phrase, "Flight or concealment by the defendants does not create a presumption that they are guilty of any crime."[22] The wording used by the trial judge was readily, perhaps more readily, understood by laymen. Even when the court's statement is considered on its face and wrenched out of context, this semantic distinction produced no practical or discernible difference in impact that could reasonably be expected to affect the minds of the jurors.[23]

Considering the language complained of in the context in which it was used, it is even more apparent that the appellants' claim of error—let alone prejudice —borders on the frivolous. The lack of prejudice is even more clear when the instruction is taken as a whole. It adequately explains the conflicting motives that may lead an innocent man to flight, and highlights the danger of drawing an adverse inference from such evidence. We find it entirely consonant with the guidelines of Austin v. United States, 134 U.S.App.D.C. 259, 414 F.2d 1155 (1969).[24]

■ As we have recently noted,[25] evidence of flight tends to be only marginally probative as to the ultimate issue of guilt or innocence. The interest of justice is perhaps best served if this matter is reserved for counsel's argument, with little if any comment by the bench.

All of this evidence was properly before the jury, and much of it came in the form of testimony by the appellants themselves. Here, the appellants' testimony explained why they went to New York, pointed out that they not only gave their names and addresses at the hotel, but actively put their identity forward in an effort to obtain compensation for a collision sustained en route. Both counsel in summation explored at length the various inferences that might be drawn from this evidence.

## D.  The Robbery Indictment.

■ The robbery counts tracked the statutory language describing the offense but did not expressly allege a specific intent on the part of the appellants to steal the property in question. Specific intent to steal is, of course, a material element necessary to constitute the offense of robbery. See (F. H.) Jackson v. United States, 121 U.S.App.D.C. 160, 348 F.2d 772 (1965).

When trial began, appellants filed a "Motion to Clarify Indictment," requesting that the trial court amend the robbery count by adding "with specific intent at the time of the taking to wrongfully convert the $1,000.00 of [the decedent] to their own use." The trial court denied this motion as not timely filed, and the appellants argue that to do so amounted to prejudicial error.

In both (F. H.) Jackson, supra, and Austin v. United States, supra, indictments identical in form to the present one were held legally sufficient, albeit in a form that "leaves much to be desired both in completeness and in clarity." The wording was held sufficient to

---

22. See United States v. Honesty, 148 U.S. App.D.C. 255, 459 F.2d 1279 (1971); Miller v. United States, 116 U.S.App.D.C. 45, 51, 320 F.2d 767, 773 (1963) (Bazelon, J., concurring); Criminal Jury Instructions, supra note 13, Instruction 2.44 at 48 (2d ed., 1972).

23. We dismiss out of hand appellants' suggestion that by instructing the jury that "flight does not prove guilt" the trial court thereby invited them to treat flight as a presumption of guilt (see Br. at 18).

Such an argument stands both language and logic on its head and can only be supported by carrying the expressio unius principle to the nth degree.

24. See also Wong Sun v. United States, 371 U.S. 471, 483, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Honesty, supra.

25. United States v. Telfaire, 152 U.S.App. D.C. 146, 151–152, 469 F.2d 552, 557–558 (1972).

charge the offense of robbery and give adequate notice of the charge defendant was held to answer.

Appellants complain that the jury was permitted to take the indictment into the jury room, and rely upon (F. H.) Jackson v. United States, in which we adverted, in reversal, to the possibility of jury reference to an indictment drafted in this manner. But *Jackson* was based on the failure of the trial court to apprise the jury in any manner of the necessity to find an intent to steal. In *Austin*, where specific intent had been amply covered in the trial court's instructions, we distinguished *Jackson* and affirmed.

Here, as in *Austin*, clear, detailed and thorough instructions amply impressed upon the jury that, in order properly to convict of robbery, a specific intent to steal the property in question must be found.

 This disposition makes it unnecessary to discuss precedents on the issue of whether, and when, courts may permit indictments to be amended.[26]

While we affirm, for the reasons stated, we urge that pertinent indictment forms be promptly updated and refined, and toward that end are directing the Clerk to bring this opinion to the personal attention of the United States Attorney.

The appellants' convictions are supported by the evidence and not impaired by prejudicial error,[27] and are accordingly

Affirmed.

---

26. In general, the Federal Courts have been extremely reluctant to amend an indictment once it has been endorsed a "true bill" by the grand jury. *See* Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); Ex parte McBain, 121 U.S. 1 (1887); 1 C. Wright, Federal Practice & Procedure § 127. In other circumstances the fact that the accused may waive indictment altogether and elect to be prosecuted by information would strongly militate toward permitting the indictment to be amended at the request of the defendant or if the defendant consented thereto. And this is especially true when, as here, the indictment as originally drafted is clearly sufficient in law. Different considerations may apply, however, when the specification sought to be amended relates, albeit indirectly, to a charge of felony-murder that is being tried as a capital offense.

There also may be some question whether all three of the appellants joined in the defense "Motion to Clarify Indictment." Although it is phrased on behalf of the defendants jointly and carries at its foot the typewritten names of each appellant's counsel, only the attorney for Robinson signed the document. The signature lines for the other attorneys are blank, and none of the defendants' signatures appear.

Although we allude to these matters, we do not purport to decide them. Since we conclude that no prejudice resulted from the trial court's refusal to amend the indictment, it is unnecessary to determine whether there was nevertheless a technical error.

27. The remaining contentions are without merit.